WARNOCK, MacKINLAY & CARMAN, P.L.L.C.
1019 South Stapley
Mesa, Arizona 85204
(480) 898-9239
Email: kent@mackinlaylawoffice.com

J. Kent MacKinlay, No. 7204
Attorney for Debtor

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re | **Chapter 11** |
| MANUEL GENE BETTENCOURT, and THELMA JEAN BETTENCOURT, | **No.    2-09-bk-32420-CGC** |
| | **DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION** |
| Debtors | |

## I.    INTRODUCTION

This disclosure statement is submitted by Manuel Gene Bettencourt and Thelma Jean Bettencourt ("Bettencourt") as debtor in possession herein, preparatory to submitting their Plan of Reorganization ("the Plan") to their creditors for acceptance. Attached hereto as Exhibit A is a Plan which Bettencourt proposes to file with the U.S. Bankruptcy Court for the District of Arizona ("the Court"), which has jurisdiction over this Chapter 11 bankruptcy case.

All parties who receive this Statement preparatory to voting on the acceptability of the Plan should study the Plan carefully and should consult their counsel with regards to its impact on their legal rights, before voting on the Plan. In the event of any discrepancy between this Statement and the Plan, the terms of the Plan control.

Bettencourt believes that, for the reasons set forth in this Disclosure Statement, the Plan represents the best possible return for creditors of the estate in the quickest possible time. Accordingly, Bettencourt recommends that creditors vote to accept the Plan.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR

INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.

BETTENCOURT IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE BEST OF BETTENCOURT'S KNOWLEDGE AND BELIEF. THE FINANCIAL INFORMATION PRESENTED HAS NOT BEEN AUDITED, AND IS BASED UPON BETTENCOURT'S OWN BOOKS AND RECORDS AND BUSINESS EXPERIENCE. THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT MEANS ONLY THAT, IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS TO MAKE INFORMED DECISIONS WHETHER TO APPROVE OR REJECT THE PLAN.

ALL VALUATIONS OF ASSETS SET FORTH HEREUNDER, ARE THE DEBTOR'S OWN OPINIONS, UNLESS OTHERWISE STATED.

The Plan will not become effective or binding upon any party in interest until it has been confirmed by the Court. The Bankruptcy Code requires that a Plan must be submitted to holders of claims against the debtors, certain of whom must be provided with an opportunity to vote on whether to accept or reject it. In addition, any solicitation of acceptances or rejections of the Plan must be accompanied by disclosure materials approved by the Court as containing "adequate information." "Adequate information" is described by the Code as information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, to enable a hypothetical reasonable investor typical of solicited claimants to make an informed judgment about the Plan and the acceptance or rejection thereof.

In short, creditors with allowed claims are entitled to vote on the Plan, and the party seeking approval of the Plan must provide those creditors with sufficient information so that they can have a meaningful vote. This is the purpose of this Disclosure Statement.

This Disclosure Statement must be approved by the court prior to Bettencourt's soliciting acceptances of the Plan. The court shall then set a hearing date for confirmation of the Plan.

2

Creditors may vote on the Plan by mailing a ballot provided by Bettencourt, after approval of this Disclosure Statement. In determining whether the Plan should be confirmed, the court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of creditors. The court will also receive and consider a ballot report prepared by Bettencourt, or their agents, concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

Acceptance of the Plan is sought only from those holders of claims which are "impaired" by the Plan: that is acceptance is solicited only from those creditors whose legal, equitable or contractual rights are altered by the Plan or who will not receive under the Plan the amount of their allowed claim in cash. Holders of claims which are not impaired under the Plan are deemed to have accepted the Plan pursuant to 11 U.S.C. 1126(f).

Section 1129(b) of the Code provides that, if the Plan is rejected by one or more impaired classes, the Plan, or modification thereof, may nevertheless be confirmed by the Court provided that the Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes of claims impaired under the Plan. It is the intent of Bettencourt to seek such confirmation by the Court in the event one or more impaired classes rejects the Plan.

The Plan provides for full principal payment of all approved claims of creditors, over time.

## II.   HISTORY OF DEBTOR

Gene Bettencourt is aged 63, Thelma Bettencourt is aged 72.  The couple were married in 1970, and have resided in Arizona since 1975.

Gene Bettencourt worked for the Federal Aviation Administration and the National Guard, since 1970.  He retired from the National Guard in 1998, and from the FAA in 2006.

Thelma Bettencourt has worked as a licensed practical nurse all of her working life, retiring as such in 2003.

The couple currently receive retirement income of approximately $6350 per month.

Throughout their working lives, the debtors have  been active real estate investors.  They have bought and sold real estate, for their own account, and in partnership with others, and have held

3

rental properties over the years.

With other investors, they acquired property for development in Christopher Creek, Gila County, Arizona. The total property comprises approximately 10 acres, and is described hereunder as the West Section, the Center Section, and the East Section.

The East Section was purchased in 2007 for $1,500,000 by an entity known as Creekside Mountain Home Developers LLC; the debtors own a 50% membership interest in CMHD; the balance is owned by Wolfgang Klien. This section contains a restaurant and a six-unit motel, and is leased by CMHD to an entity known as Creekside Diner L.L.C.

Creekside Diner L.L.C. operates the restaurant and motel. Its principal Cindy Fitch owns a 90% membership interest in this LLC. The debtors own a 5% membership interest. Wolfgang Klien holds the other 5%.

The West Section consists of 4 lots, which the debtors propose to sell on an individual lot basis. They sold the first such lot in late 2009, shortly before filing bankruptcy, to John Marksbury, for $250,000 under an agreement of sale. Mr. Marksbury is presently current on his monthly payments under that contract of sale. Other lots are currently rented to tenants, who currently pay a total of $600 per month.

The West Section was acquired in 2004 for $412,000. The purchase was made by a group including the debtors, and the following sums have been contributed, to purchase and improve the property:

| | |
|---|---|
| The Debtors | $200,000 |
| John and Diana Pierce | $350,000 |
| Raye Jean Cottle | $150,000 |
| Todd & Teresa Bushey | $120,000 |
| | $820,000 |

Title to the West Section is in the name of the Debtors as to an undivided 78% interest, and as to Raye Jean Cottle as to an undivided 22% interest.

The Center Section was originally acquired by CMHD in 2005 for a price of $415,000. It was sold by CMHD in 2008 to an unrelated entity named Howee Holdings LLC, for $55,000 cash

4

plus the assumption of existing debt of $215,000 owed to M&I Bank and second lien financing of $617,500 in favor of CMHD as seller. The debtors reacquired this property from Howee Holdings LLC shortly before filing bankruptcy, in return for assumption of the existing financing and the issuance of a $55,000 junior deed of trust in favor of Howee. The debtors also granted a lien over this section to their bankruptcy counsel, as a retainer to secure legal fees in excess of a $5,000 cash retainer.

The loan from M&I Bank secured by the Center Section matured in March, 2009. M&I refused to renew this financing. The debtors had also borrowed approximately $423,000 from M&I Bank on the security of a vacant lot at 16717 E. Greenbrier Lane, in order to refinance the East Section for CMHD. Finally, M&I held a deed of trust over the West Section, to secure a separate loan of approximately $319,000.

M&I commenced trustee's sales proceedings on each of these loans. The debtors filed for Chapter 11 bankruptcy protection on December 16, 2009, in order to stop the trustee's sales and to reorganize.

## III.    POST-BANKRUPTCY DEVELOPMENTS

The following creditors have filed motions to lift the automatic stay, seeking permission to foreclose on the Debtors' property:

M&I Marshall and Ilsley Bank ("M&I Bank") - as to the West Section of the Christopher Creek property.

M&I Bank - as to the Greenbrier Lot.

Prime Asset Fund L.L.C. ("Prime Asset") - an assignee of M&I Bank, as to the Center Section of the Christopher Creek property.

The Debtor is currently defending each of these three actions. It has come to an agreement with Prime Asset as to the latter's loan, and documentation to that agreement is in process.

As to the Center Section, the debtor has come to a preliminary agreement with an outside lender, to develop the site into forty mobile home units. That agreement is described below.

Detailed information as to each of the Debtors' properties and the loans which were secured by such properties is set forth below.

5

**IV.    TREATMENT OF CLAIMS**

4.1    CLASS I.    Administrative Expenses.

Administrative expense claims, which are approved either by the debtor or by the court, along with any outstanding fees to the U.S. Trustee, shall be paid in full in cash within 30 days of the Effective Date, unless the creditor agrees to extended payment terms.

The debtors anticipate that administrative expense claims will not exceed $10,000.  The principal claimant in this Class will be the debtor's bankruptcy counsel, Warnock, MacKinlay & Carman, PLLC.  That firm has received a cash retainer of $5,000, and holds a security on the Christopher Creek Center Section to secure the balance that will be owed to it.

4.2    CLASS II.    Property Taxes.

Any and all property taxes owed to either the Maricopa County Treasurer or to the Gila County Treasurer, shall be paid in full within 180 days of the Effective Date of the Plan.

The Debtor believes that the Gila County Treasurer is owed approximately $3,500, for 2009 taxes on all of the Christopher Creek properties.

As to the Maricopa County properties which they intend to retain, they believe that they owe property taxes as follows:

Milbrae Property (Section 4.4) - current

Personal Residence (Section 4.5) - current except for 2009 taxes

Gail Drive Property (Section 4.6) - current

164th Place Property (Section 4.8) - 2009 taxes of approximately $1,200 owed

Utah Property (Section 4.9) - current

4.3    CLASS III.    Income Taxing Authorities.

The Debtors shall pay all claims of the Internal Revenue Service ("IRS") and the Arizona Department of Revenue ("ADOR"), which are approved either by the debtor or by the court, together with interest at the rate set by the Internal Revenue Code, calculated from and after the Effective Date of the Plan, in 60 equal monthly installments, commencing 30 days following the Effective Date.

Insofar as the Debtors are aware, they have no outstanding debts owed to either the IRS or

6

the ADOR.

4.4 CLASS IV. Everhome Mortgage or Assignee as Holder of a first lien on 3048 East Milbrae, Gilbert, Arizona.

The Debtors purchased this property, a single family home, for rental purposes, in 2003, for $175,000. There is a first deed of trust loan in approximately the amount of $175,000 on the property. The Debtors have a pending sale of the property to the current tenant, a long-term resident of the property, for a price of $219,000. However, that purchaser has been unable to obtain a loan to finance the purchase.

In the meantime, the property produces rent of $1600 per month. Payments on the mortgage loan are $690 per month (interest, taxes and insurance only). The loan is current.

The debt owed to Everhome Mortgage or Assignee secured by a first deed of trust on that single family residence at 3048 Milbrae, Gilbert, Arizona, shall continue to be paid according to its present terms, excepting that:

(a) any arrears currently owed shall be capitalized and paid at maturity of the note evidencing this debt; and

(b) the note may be prepaid in whole or in part at any time without penalty

4.5 CLASS V. GMAC Mortgage

The Debtors purchased their residence at 15819 East Sycamore Drive, Fountain Hills, Arizona for $350,000 in 1998. They owe GMAC Mortgage approximately $800,000 on a loan secured by a first deed of trust on this property. The loan from GMAC carries a variable interest rate, currently 3.75% per annum, and is payable interest only monthly. The Debtors are current in their monthly payments of approximately $2300 per month, on this loan. Because this property is their primary residence, under bankruptcy law, the debtors cannot modify this loan without the consent of the lender.

The debt owed to GMAC Mortgage secured by a first lien on the debtors' residence at 15819 East Sycamore Drive, Fountain Hills, Arizona, shall be treated as fully secured. The debtors shall pay the full principal amount owed to GMAC Mortgage. They shall also pay interest at the current note rate of 3.75% per annum, which henceforth shall be a fixed and not a variable rate. The debtors

shall continue to pay regularly scheduled monthly payments at this rate, from and after the Effective Date, and shall repay the entire balance owed on or before 10 years from the Effective Date, by sale or refinancing of the property. They shall also continue to keep property taxes and insurance current. Any arrears owed on the Effective Date shall be capitalized and paid at the maturity of the note. In the event of default, the debtors may convey the property to the creditor by deed in lieu of foreclosure, or by allowing a trustee's sale of the property at the option of the creditor. Any such conveyance or acquisition of the property by the creditor or the creditor's assigns, shall constitute full satisfaction of the debt.

The failure of this creditor to object to the Plan, shall be deemed to be consent to this treatment.

4.6    CLASS VI.    <u>BAC Home Loans Servicing</u>

The Debtors purchased a property at 1460 East Gail Drive, Chandler, Arizona, in 2006, for $230,000. The property is a single family home, and the Debtors acquired it for the purpose of renting it out.

The property is currently rented at $1,000 per month. The Debtors believe that its current market value is no more than $140,000, based upon a broker's price opinion.

BAC Home Loans Servicing holds both a first and a second deed of trust on this property, to secure loans in the approximate principal amounts of $180,000 and $22,000 respectively.

The debtors will treat the loan secured by the first deed of trust as secured in the amount of $140,000, and unsecured for the balance. The debtors will treat the loan purportedly secured by the second deed of trust as unsecured and as a general unsecured claim.

The secured portion of the claim will be paid with interest at the rate of 5% per annum, in monthly installments commencing with the Effective Date of the plan, in an amount sufficient to amortize the secured claim over a period of 30 years. With those monthly installments, the debtors will also pay monthly to an impound account maintained by the creditor, 1/12 of estimated annual property taxes and insurance costs.

The unsecured portion of the claim heretofore secured by a first deed of trust, together with the entire balance owed on that claim heretofore secured by a second deed of trust, shall be paid at

8

the same time and manner as Class XVII.

The creditor shall retain the lien securing the first trust deed loan, but such lien shall be discharged upon payment of the principal sum of $140,000. The lien securing the $22,000 loan shall be discharged, upon confirmation of the plan.

4.7    CLASS VII.    Lot 2E- Rio Verde

The Debtors acquired a parcel of vacant land known as Lot 2E-Rio Verde, Scottsdale, Arizona, in 2005, for $125,000.

Bank of America holds a first deed of trust on this property to secure a loan in the original principal amount of $100,000. The Debtors believe that the property is worth approximately the same as the loan amount, or slightly less. After borrowing these monies, the debtors deeded the property to an entity known as Building Arizona Homes LLC, in which they own a 50% equity interest. Debtors will permit the lien holder to conduct a trustee's sale of the property, and take back the property in full satisfaction of the obligations of the debtor thereon. Debtors waive their rights to this property, in favor of the Class VII creditor.

4.8    CLASS VIII.    Merchants Funding

Merchants Funding holds a first deed of trust on a single family residence at 29525 N. 164th Place, Scottsdale, Arizona, to secure a loan in the approximate amount of $551,000. The Debtors built this property in 2005 for the purpose of selling it. It is currently rented for $2,150 per month, to a tenant who has occupied the property since October, 2009.

The loan presently calls for payments of approximately $2450per month, interest only. The Debtors are current on their obligations on this loan.

The debtors will pay the full amount owed to Merchants Funding, together with interest at 3.75% per annum. This represents a reduction from the current note rate of 5.5%. This amount shall be paid in regular monthly payments of principal and interest, to commence on the Effective Date, in an amount sufficient to amortize the debt over 30 years . Along with such payments of principal and interest, the debtors will make an impound payment each month of 1/12 of estimated annual property taxes and insurance.

The entire unpaid balance of principal and interest will be paid in full 10 years from the

9

1  Effective Date.

2      4.9    **CLASS IX.**    <u>Washington Mutual</u>

3      The Debtors acquired a property known as 3034 S. Hadley Court, West Valley City, Utah

4  in 1997, for a price of approximately $95,000. They currently value the property at $170,000. They

5  owe approximately $102,000 on a loan secured by a first deed of trust on the property. That loan

6  calls for payments of approximately $850 per month, PITI; the property is rented for $1,000 per

7  month to a long-term tenant.

8      Washington Mutual Bank holds the first deed of trust over this property. The debtors will

9  treat this claim as fully secured, and will pay the debt according to its terms, excepting that any

10 arrearages owed on the Effective Date shall capitalized and paid at maturity.

11     4.10    **CLASS X.**    <u>Prime Asset Fund II</u>

12     Prime Asset Fund II as assignee of M&I Bank holds a first deed of trust over a property

13 known as Lot 1, Christopher Creek, Christopher Creek, Arizona, to secure a loan in the amount

14 allegedly owed of $226,243.57. This property is referred to hereinabove as the "Center Section" of

15 the Christopher Creek property.

16     This property was acquired in March, 2005 for $415,000, by Creekside Mountain Home

17 Developers, LLC ("CMHD"). The Debtors own a 50% interest in CMHD; the other 50% interest

18 in CMHD is held by Wolfgang Klien.

19     At the time of purchase, CMHD made a down payment of $115,000, and financed the

20 balance through a loan of $300,000 from M&I Bank. CMHD paid that loan down to $215,000.

21     CMHD then sold this property to Howee Holdings LLC in 2008 for $55,000 in cash,

22 assumption of the first deed of trust loan from M&I Bank of $215,000, and a second deed of trust

23 loan from CMHD of $617,500.

24     Shortly before the Debtors filed bankruptcy, Howee Holdings sold this property to the

25 Debtors, in exchange for assumption of the existing first and second deed of trust loans (in favor of

26 M&I Bank and CMHD respectively), and for a note of $55,000, secured by a junior deed of trust on

27 the property.

28     During the bankruptcy, M&I Bank sold its first trust deed loan to Prime Asset Fund II L.L.C.

The loan was current as of March, 2009, but M&I Bank refused to renew the loan upon maturity, or to accept partial payments thereafter.

The Debtors intend to develop this property (the Center Section) into a mobile home park. It comprises approximately 4 acres, and is currently zoned to permit 28 mobile homes.

The Debtors have negotiated financing with joint venture partners named Jerry McCreary and Albert Strasser, who will in general terms:

a) advance monies to bring the loan now held by Prime Asset Fund II, current, and to pay future monthly instalments owed to Prime;

b) bringing in new mobile homes, for the purpose of renting or selling such units.

Messrs. McCreary and Strasser are experienced in the field of mobile home sales and rentals. Although the property is currently zoned to permit only 28 mobile home spaces, there is enough room under existing zoning laws, to increase this density to a total of 40 units. The Debtor projects rents of $300 per space, or ultimately $12,000 per month, when the property is fully developed. They expect to receive $4,000 per month as net cash flow from their 50% share of this joint venture, when the project is fully developed. This is expected to occur within the next 12 months.

The Debtors have also come to an agreement with Prime Asset Fund, to bring this loan current, and to extend the maturity date for an additional one year from the Effective Date. This agreement is in the course of being documented and presented to the court. Payments to this creditor will commence when the agreement is approved by the court.

The debtor will pay the full amount owed on this claim, in an amount to be approved either by the debtor or by the court, together with interest at the current non-default rate, in monthly payments of $1,060 per month, to commence on the Effective Date of the plan, until paid. This creditor will continue to hold its first lien upon the property.

Under the Plan of Reorganization, this claimant will provide partial releases of its deed of trust, upon receipt of a payment equal to 1.15 times the approved amount of this debt times a fraction, the numerator of which is the portion of the collateral to be released, measured in square feet, and the denominator of which is the total amount of collateral in square feet which presently secures the loan.

11

4.11   CLASS XI.   <u>Creekside Mountain Home Developer, LLC</u>

Creekside Mountain Home Developer, LLC ("CMHD") is an entity in which the debtor holds a 50% equity interest. CMHD has held a second deed of trust over the Center Section of the Christopher Creek property since June 16, 2008, (when it sold the property to Howee Holdings, LLC), to secure a loan in the amount of $617,500. The Debtor's bankruptcy counsel holds an assignment of this deed of trust, to secure its fees.

The debtors will pay the full principal amount of this claim, together with interest at the non-default note rate, on or before five years from the date hereof, or earlier, upon the sale of this property, CMHD will continue to hold its present lien on the property, but will grant partial releases thereof so long as all of the net proceeds of sale of any portion, are applied on the loan secured by the first deed of trust described in paragraph 4.10, until such lien is paid in full. Thereafter, CMHD will grant partial releases on the same basis as set forth in paragraph 4.10 hereof.

On the other hand, CMHD owes the debtors $423,000 plus interest, on a loan secured by a deed of trust over the East Section. The debtor's obligations to CMHD, will be partially offset by CMHD's obligations to the debtors.

CMHD will subordinate its lien to any new first trust deed, the amount of which does not exceed the amount now owed to Prime Asset Fund.

4.12   CLASS XII.   <u>Howee Holdings LLC</u>

Howee Holdings LLC holds a third deed of trust over the Center Section of the Christopher Creek property (aka known as "Lot l" , or as Lots M, P, Q, R, and S), junior to the deeds of trust in favor of Prime Asset Fund II, and CMHD, to secure a loan in an amount of $55,000.

The debtors will pay the full principal amount owed to Howee Holdings LLC, together with interest at the present non-default rate set forth in the note, on or before six years from the Effective Date of the plan, or earlier, upon the sale of all of the property securing this debt. This claimant will provide partial releases of its deed of trust, so long as all proceeds of sale of any portion of its collateral, are applied in satisfaction of the claims owed by senior lien holders.

This creditor will subordinate its lien to any new first or first and second trust deeds, the amount of which do not exceed $850,000.

12

4.13    CLASS XIII.  M&I Bank

M&I Bank holds collateral as follows, to secure the following debts owed to it.

Loan A

A  loan in the approximate amount of  $319,463.00, secured by a first deed of trust on lots in the Christopher Creek subdivision known as the West Section.

Loan B

A first deed of trust on a vacant lot at 16717 East Greenbrier Lane, Fountain Hills, Arizona, to secure a loan in the approximate amount of $423,000.

As to Loan A, M&I asserts that its collateral for Loan A is worth $201,000. The Debtors will accept this valuation, for purposes of plan confirmation.

The secured portion of Loan A shall be paid with interest at the rate of 7.25% per annum, being the present non-default interest rate set forth in the note evidencing such debt.  This amount will be paid in monthly payments sufficient to amortize the loan over 30 years, but the balance will be paid in a balloon payment 10 years following the Effective Date, either by sale or refinancing of the property securing the debt.  The Debtors will also pay 1/12th of the estimated annual taxes along with such monthly payments.  The unsecured portion of the claim, in an amount to be approved either by the debtor or by the court,  shall be paid  pro-rata with, and at the same time, as general unsecured claims in the matter as set forth in Article 4.17.

As to Loan B, M&I Bank asserts that the value of its collateral is $160,000. The debtors will treat Loan B as secured in the amount of $160,000, and unsecured for the balance, in an amount to be approved either by the debtor or by the court.

The secured portion of this claim shall be paid with interest at the rate of 6% per annum, with monthly payments sufficient to amortize the loan over 30 years.  The debtors will also pay 1/12 of the estimated annual taxes along with such monthly payments.  The unsecured portion of the claim shall be paid at the same time as general unsecured claims, in the manner set forth in Article 4.17.

The debtors anticipate that these payments will be made by Creekside Diner LLC.

M&I Bank shall continue to hold its present liens, to secure loans in the amounts set forth above.  Once the secured portions of its loans are paid in accordance with the foregoing, the liens

13

will be discharged.

4.14    CLASS XIV.   Lenders Who Have Completed Foreclosure

Any lenders who have completed trustee's sales of property owned by the Debtors, or owned by others whose debts were guaranteed by the Debtors, shall retain the collateral repossessed by them, in full satisfaction of their claims against the Debtors.  To the best of the Debtors' recollection, this Class comprises only Bank of America, who foreclosed its two liens secured by 11976 East Casitas del Rio Drive, Scottsdale.

4.15    CLASS XV.   Administrative Convenience Class

Each Class XV claimant whose claim of under $1,000 is approved either by the debtor or by the court, shall have the following options:

(a) To elect to accept a cash sum equal to 60% of the amounts of such approved claim, thirty days following the Effective Date, in full satisfaction of such claim, or

(b) To accept payment in the same manner and on the same terms as Class XVII claimants.

Such election shall be made by each such Class XV claimant at the same time as such claimant casts its ballot to confirm or reject this Plan.  In the event no such election is made by a Class XV claimant, such claimant shall be deemed to have elected treatment in accordance with Option (b) hereinabove.

In addition, any Class XVII claimant whose claim is in excess of $1,000.00, and whose claim is approved either by the Debtor or by the court, shall have the option of receiving the sum of $600 in cash, 30 days following the Effective Date, in full satisfaction of such claim.  Such option must be exercised in writing at the time a ballot is cast to confirm or reject the Plan.

Insofar as the Debtors are currently aware, they have no creditors in this Class.

4.16    CLASS XVI.   John and Diana Pierce, Raye Jean Cottle, and Todd and Teresa Bushey

The claims of Class XVI creditors are approved in the following amounts:

John and Diana Pierce          $350,000

Raye Jean Cottle               $150,000

Todd and Teresa Bushey         $120,000

14

These creditors loaned or invested monies in the Christopher Creek West Section. Title to this property is held as to a 78% undivided interest by the debtors, and as to a 22% undivided interest by Raye Jean Cottle.

The Debtors will transfer their ownership in the Christopher Creek West property to a new limited liability company in which they will be credited with a $200,000 capital investment. Raye Jean Cottle will transfer her ownership interest to that same property to the same LLC, in return for a $150,000 capital credit. John and Diana Pierce will receive a $350,000 capital credit, and Todd and Teresa Bushey will receive a $120,000 capital credit.

Distributions from this LLC will be made in the following priority:

(a)    first, to repay the capital investment account of each Class XVI creditor, pro rata, until all such capital investment has been returned;

(b)    next, to repay the capital investment account of the debtors;

(c)    any balance will be divided amongst the members, pro rata

4.17    CLASS XVII.  General Unsecured Creditors.

All other creditors not specifically included in any other class, shall be included in Class XVII.

The Debtors shall pay, without interest, the full principal amount of all approved claims in Class XVII. Such sum shall be divided pro rata amongst all creditors in this class and the unsecured portion of the claims of creditors in Classes VI (BAC Home Loans Servicing) and XIII (M&I Bank). Such sum shall be paid without interest as follows:

(a) 10% of each such claim within 4 years from the Effective Date

(b) an additional 15% of each such claim within 5 years from the Effective Date

(c) the balance in equal installments of 25% each on the sixth, seventh, eighth and ninth anniversaries of the Effective Date.

Insofar as the Debtors are aware, this Class will consist of the following:
(a) Five credit card issuers, who are owed a total of approximately $75,000

(b) M&I Bank - unsecured portion of loan described as Loan A in paragraph 4.13, approximately  $118,463

15

(c) M&I Bank  -  unsecured portion of loan described as Loan B in paragraph 4.13 - approximately $263,000

(d) BAC Home Loans Servicing - unsecured portions of loans described in paragraph 4.6 - $72,000

Thus, the total debt owed to this class is estimated at approximately $528,4623.

The debtors hereby approve those Class XVII claims listed in Exhibit B hereto, in the amounts set forth in Exhibit B.

## V.    MEANS FOR IMPLEMENTATION OF PLAN

5.1    CLASS V  Personal Residence.

The Debtors will make the payments on the  mortgage on their personal residence (Class V) from their retirement income of $6,350 per month.

5.2    Rental Homes.

The Debtors will make the monthly payments on the following rental properties owned by them, firstly from the rental incomes derived from such properties, supplemented as necessary by their retirement income:

3048 Milbrae, Gilbert (Class IV)

1460 East Gail Drive, Chandler (Class VI)

29525 North 164th Place, Scottsdale (Class VIII)

3034 South Hadley Court, West Valley City, Utah (Class IX)

The current rental income and the projected mortgage payments under the Plan, are set forth in Exhibit C hereto.

5.3    CLASS X

The payments required under the Plan to Prime Asset Fund II (Class X) will be paid initially from:

a) funds borrowed from Messrs. McCreary and Strasser

b) the rental of mobile home lots

The loan balance then remaining will be repaid from  refinancing of the property within one year

16

5.4    Loans From  M&I Bank

The loan from M&I Bank secured by the West Section of the Christopher Creek property (Loan A) (Class XIII) shall be paid initially from rentals of mobile homes, and from payments received from John Marksbury under the agreement of sale in which he is purchaser.  The loans will be retired from the sale of individual lots within the West Section.

The secured portion of  Loan B will be paid from the debtor's retirement income.

5.5    Lump Sum Payments

The lump sum payments required under the Plan shall be derived from sale or refinancing of any or all of the Debtors' property, and/or from distributions from CMHD and the new LLC that will be created to own the Christopher Creek West Section.

Attached as Exhibit D are the Debtors' projections of cash flow over the ensuing four years of their Plan.  The bulk of the cash flow will come from development of the Christopher Creek project, which will produce income to the Debtors through their ownership interest in the properties, and through their ownership in the two LLCs who will have an ownership interest in the West Section, and a security position of $617,500 in the Center Section.

## VI.    FEASABILITY

Attached as Exhibit C hereto are the debtor's projections of their cash flow over a period of 12 months following the Effective Date of the Plan.  The debtors project a negative cash flow from property of $1,249 per month during this period.  Their retirement income of $6,350 is more than sufficient to cover this.

Beyond one year, the debtors lump sum obligations will be on the loan from Prime Asset Fund (Year 1), payments to unsecured creditors (Years 4 through 9), and the obligations to CMHD and Howee Holdings.  These obligations and the anticipated sources of repayment are listed in Exhibit D.  In year 10 and beyond, retirement of the house mortgage loans maturing then, is expected to come from the sale or refinancing of these properties.

## VII.    LIQUIDATION ANALYSIS

The alternative to the Plan of Reorganization, is immediate liquidation of the Debtors' assets. The Debtors are proposing in this Plan, a 100% payment of principal to each of their creditors, albeit

17

over an extended period of time.

If the Debtors' assets were immediately liquidated by a Chapter 7 bankruptcy trustee, their retirement income would not be available to service the secured debts listed hereinabove. Were any of the Debtors' real property assets to be sold on a forced sale basis - as would be necessary in order to meet the monthly obligations to secured creditors - it is doubtful that any significant equity could be realized to pay unsecured creditors. A primary source of repayment for unsecured creditors, must come through development of the Christopher Creek properties. This could not happen in a Chapter 7 liquidation.

The Debtors have only the following personal property which would be available to pay creditors claims in a Chapter 7 liquidation:

(a) paintings - $10,000

(b) interest in Creekside Mountain Homes Developers LLC ("CMHD"), the value of which is projected by the debtors at $617,500 (the amount of CMHD's second deed of trust loan on the Center Section property). This entity also owns the East Section property. This interest is not likely to produce anything meaningful for unsecured creditors if it had to be liquidated now, prior to development.

( c) interest in new LCC that will own the West Section - no liquidation value

(d) interest in Creekside Diner LLC - no liquidation value

(e) loan receivable from CMHD, of $423,500, secured by a second deed of trust on the East Section owned by CMHD and currently occupied by Creekside Diner LLC. In a liquidation, this property is unlikely to bring anything more than the amount required to repay the first mortgage debt of $650,000 owed to Merchants Funding.

(e) contract receivable from John Marksbury - $250,000 - M&I Bank has security

(f) loan receivable from Howard Thruston of $175,000 - deemed uncollectible

(g) loan receivable from Paul Altfus of $45,000 - deemed uncollectible

(h) computers - $1500

The Debtors do not believe that liquidation of any of the foregoing assets would produce any meaningful amounts for unsecured creditors, after expenses of liquidation and trustee's fees. Thus,

18

1    the Debtors believe that their Plan offers the best opportunity for creditors to receive a return.

2    Indeed, the Debtors project a full principal payout to all creditors.

3    **VIII.  LITIGATION**

4         The Debtors are not currently involved in any litigation, other than the lift stay litigation with

5    M&I Bank and Prime Asset Fund II referred to hereinabove.

6    **IX.  VOTING**

7         Creditors holding allowed claims which are impaired, and parties in interest whose interests

8    are impaired, are entitled to vote.

9         Ballots will be sent to the known holders of allowed claims and all disputed claims.

10   However, only the holders of allowed claims or allowed interests (or claims and interests which are

11   deemed allowed or have been estimated by the Court) who are impaired are entitled to vote on the

12   Plan. A claim to which an objection has been filed is not an allowed claim unless and until the Court

13   rules on the objection and any appeals are finally determined. The holders of such disputed claims

14   are not entitled to vote on the Plan unless they request that the Court, pursuant to Rule 3018, Federal

15   Rules of Bankruptcy Procedure, temporarily allow their claims in appropriate amounts solely for the

16   purpose of enabling the holders of such disputed claims to vote on the Plan, and the Court grants

17   such request.

18        The forms of ballot for each of the classes entitled to vote on the Plan will be sent to you

19   with a copy of the Court-approved Disclosure Statement and the Plan. Please read the ballot

20   carefully. If you have any questions concerning voting procedures, you may contact Moustakas's

21   attorney, J. Kent MacKinlay, at the address provided immediately below.

22        **YOU MUST RETURN YOUR BALLOTS TO:**

23                  J. Kent MacKinlay
                    WARNOCK, MACKINLAY & CARMAN, P.L.L.C.
24                  1019 S. Stapley Dr.
                    Mesa, Arizona 85204
25                  (480) 898-9239

26        Even though a creditor may not choose to vote or may vote against the Plan, the creditor will

27   be bound by the terms and treatments set forth in the Plan if the Plan is accepted by the requisite

28   majorities in each Class of creditors and/or is confirmed by the Court. Creditors who fail to vote will

19

not be counted in determining acceptance or rejection of the Plan. Allowance of a claim or interest for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the terms of the Plan. Any claim to which an objection has been or will be made will be allowed only for distribution after determination by the Court. Such determination may be made after the Plan is confirmed.

In order for the Plan to be deemed accepted by a class of creditors deemed impaired, creditors that hold at least two-thirds (2/3) in the dollar amount and more than one-half (1/2) in the total number of allowed claims of creditors in that class who vote on the Plan must accept the Plan. Under certain limited circumstances more fully described in 11 U.S.C. §1129(b), the Court may confirm a Plan notwithstanding the rejection thereof by more than 1/3 in amount or 1/2 in number of the creditors of any given class voting on the Plan. The debtor intends to seek confirmation under 11 U.S.C. §1129(b) in the event one or more classes of creditors or parties in interest rejects the Plan.

## X. DISCHARGE OF THE DEBTOR

Upon confirmation of the Plan, Bettencourt will be discharged of all claims and liabilities arising prior to the filing of the bankruptcy petition, pursuant to 11 U.S.C. 1141, excepting for the obligations set forth in the Plan.

DATED this 21st day of April, 2010.

/s/ Manuel Gene Bettencourt
Manuel Gene Bettencourt

/s/ Thelma Jean Bettencourt
Thelma Jean Bettencourt

/s/ J. Kent MacKinlay, #007204
Attorney for Debtor

20

1
2
# EXHIBIT B
3
4 <u>Claims Approved by Debtors in Class XVII (General Unsecured Creditors)</u>

5 AARP (Credit Card)     $14,000

6 American Express (Credit Card)  $15,123.70

7 Bank of America  (Credit Card xxx 7703) $20,307.78

8 Bank of America (Credit Card xxx 6157) $18,690.36

9 Chase Bank (Credit Card)   $16,698.19

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

Schedule of Monthly Mortgage Payments and Source of Payment Thereof

| Property | Creditor | Monthly Payment | Payment & Source of Payment | Net Cash Flow from Property |
|----------|----------|-----------------|----------------------------|------------------------------|
| 3048 E. Milbrae | Everhome Mortgage | $690 (ITI) | Rent - $1,600 | $910 |
| 15819 E. Sycamore | GMAC | $2,300 (PI) | | $2,300 |
| 1460 E. Gail | BAC Home Loan | $700 | Rent - $1,000 | $300 |
| 29525 N 164th Pl | Merchants Funding | $2,550 | Rent - $2,150 | $(400) |
| 3034 S. Hadley Ct. | Wash. Mutual | $850 | Rent - $1,000 | $150 |
| Center Section Prime | Asset Fund | $1,060 | Jt. Ventures Partners - $1,060 | $0 |
| West Section | M&I Bank | $1,371 | J. Marksbury - $850 Lot Rentals - $600 | $79 |
| Greenbrier | M&I Bank | $959 | Creekside Diner - $959 | $0 |
| | TOTAL | $10,468 | $9,219 | ($1,249) |

Other Income - Retirement Income $6,350

TOTAL NET CASH FLOW $5,101

# **EXHIBIT D**

| Lump Sum Payments Required Within Six Years of Effective Date of Plan | | Term | Source of Payment |
|---|---|---|---|
| Prime Asset Fund | $226,244 | 1 year | (a) Joint Venturer Financing<br>(b) Sale of mobile home lots - Center Section<br>(c) Refinancing |
| Creekside Mountain Home Developer | $617,500 | 6 years | (a) Offset of $423,000 loan owned by CMHD<br>(b) Sale of mobile home lots - Center Section<br>(c) Refinancing |
| Howee Holdings | $55,000 | 6 years | (a) Sale of mobile home lots<br>(b) Refinancing |
| Class XVII | $52,846 | 4 years | Repayment of debt of $423,000 owed by CMHD - to be made from sale by CMHD of East Section |
| | $79,269 | 5 years | Distributions from repayments received |
| | $132,115 | 6 years | (a) Payments to be received by CMHD on $617,500 loan, to come from sale of mobile home lots, and distributions to debtors therefrom - $308,750<br>(b) Return of capital in new LLC which will be owner of WestSection |

23